the common act of a person stopping a moment for any purpose on the sidewalk of a bridge. The learned justice excluded the idea of contributory negligence, and placed the nonsuit on the ground that the defendant was not liable, because the plaintiff was putting the railing to an unauthorized use. We cannot agree with this view. Section 24, p. 215, Laws 1872, reads as follows: "No new street on newly laid out or newly mapped lands shall be adopted, laid out, opened, and worked or graded in said city, by said common council, unless the same shall be sixty feet wide, and said common council shall have no power to order the same opened, laid out, worked, or graded, nor to accept any such street or highway, or dedication of any such street or highway, hereafter dedicated, unless the same shall be of the width of sixty feet."

The defendant urges further that by statute the streets of the city must be 60 feet wide, and that this bridge is only 30, and therefore the city had no right to accept it. Evidently the statute cited refers, not to "bridges," but to "streets and highways," strictly so called, because it speaks of opening, working, laying out, and grading,—expressions not applied to bridges.

The defendant further urges that defendant had no right to construct or keep a bridge over this branch of the Mohawk, and would have been a trespasser in going on the bridge to make repairs. This contention rests on the cases of *Carpenter* v. *Cohoes*, 81 N. Y. 21, and *Veeder* v. *Village of Little Falls*, 100 N. Y. 343, 3 N. E. Rep. 306. But these are quite different from this. There it was held that the city was not bound to go upon an approach to a bridge, and put a railing thereon, where the approach and the bridge were state property. Now, in this case, Adams built this bridge in 1876 from an island owned by him to vacant land on the west side of the south branch of the Mohawk. He sold building lots on his island, and houses were built thereon. People used the bridge in crossing from his island to the other part of the city. The bridge was within the city limits. In 1886, as above stated, the common council passed a vote accepting this bridge, and declaring it open to public travel. After the freshet of 1887, above mentioned, the street superintendent repaired the bridge, putting in new floor timbers. His attention was then called to this defective railing. Whether the state might not cause this bridge to be removed, we need not say. It had been allowed to remain some 12 years, and had been used by the public during that time. The case comes within that of *Sewell* v. *City of Cohoes*, 75 N. Y. 45. Judgment reversed, new trial granted, costs to abide the event. All concur.

---

CROUSE *et al.* *v.* BAILEY, Sheriff.

*(Supreme Court, General Term, Fourth Department.* May 23, 1890.)

For majority opinion, see 10 N. Y. Supp. 273.

MERWIN, J., *(dissenting.)* I doubt about the propriety of a reversal. The execution against W. R. Fuller was delivered to the defendant as sheriff on 27th of January, 1886. The defendant, in acknowledging its receipt, informed the plaintiffs' attorney that he had a levy on Fuller's stock of goods on a prior execution. On the 3d of February the defendant wrote plaintiffs' attorney that the other execution was against Frank H. Fuller, and that W. R. Fuller claimed he was worth nothing. Defendant in his letter further said that there were goods enough in the store to pay all the claims in his, the sheriff's, hands. He said nothing about not having levied under the plaintiffs'· execution. On the 5th of February, plaintiffs' attorney wrote defendant, "We want our levy held." On the 26th of February the attorney wrote the defendant about the claim, saying, among other things, "We shall make no point against you on holding over sixty days, so please write us what

you wish in the premises, and what you think best to be done." On March 29th the attorney wrote the defendant that the plaintiffs wished him to see and collect the execution out of any property in the possession of the defendant in the execution unless he paid, and, "if you wish bond from us, so advise." Thereupon the defendant asked for a bond of indemnity, and it was given him on the 26th of April. No sale was made, and the matter ran along for some time. On October 18th plaintiffs' attorney wrote defendant: "We want the above matter closed up without any more delay. We have long since, and at your request, sent you a bond to protect you on your levy." On December 31st the defendant wrote the attorney, "I saw Mr. Fuller a few days ago, and he said he had a mortgage of $100 that he would turn out to satisfy your judgment in part, and would pay the balance as soon as he could." Nothing was paid the plaintiffs, the execution was not returned, and this action was brought the 27th of January, 1887. Very clearly the plaintiffs supposed, and had a right to suppose, from what the defendant said and did, that the defendant had a levy upon their execution on the store of goods in the possession of W. R. Fuller. The bond of indemnity was given on this basis, and was received by the sheriff on that basis, if he acted in good faith. The defendant has now no right to say that the bond was not given during the life of the execution. If he did not in fact make a levy, it was his duty to have done so. But the defendant now says that, notwithstanding he asked for and received a bond, still he was not obliged to go on and sell. The Code, § 1419, says that if, after an inquisition in favor of a claimant, an undertaking to indemnify is given, "the officer must detain the property as belonging to the judgment debtor." Assume, however, that the officer could still refuse to go on, he by doing so took upon himself the burden of showing that the property did not belong to the defendant in the execution. Has he done so in this case? The referee says not, and finds that the property was the property of W. R. Fuller. It was certainly in his possession and control. The defendant himself testifies: "So far as I could see, W. R. Fuller was in possession of the goods and selling them, and had charge of the store. No one else made any claim to the goods to me but W. R. Fuller. He run the store nearly up to his death, in December, 1887." F. H. Fuller was not called as a witness, nor was it shown that he in fact owned the goods. The evidence of insolvency that was offered does not necessarily show that W. R. Fuller did not own the goods. The return by defendant of the plaintiffs' execution *nulla bona*, on the day of the trial of this action, was not entitled to any weight on this question. I am inclined to the opinion that the finding of the referee, in effect, that the defendant had not shown that the property did not belong to W. R. Fuller, should not be disturbed. The delay of the defendant after receiving plaintiffs' bond was evidently for the accommodation of Fuller, and upon his promise to pay the execution; he did not delay because some one else claimed the property. I think the judgment should be affirmed.